# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MARY BERNICE ANDAZOLA,
MAUREEN EARNEST,
and SUSANA PEREZ,

  **Plaintiffs,**

vs.            **No. CIV 00-919 JP/LFG-ACE**

COUNTY OF CHAVES, State of New Mexico,
HUBERT QUINTANA, CHAVES COUNTY
MANAGER, ADMINISTRATOR SAM
TRUELOCK, CPT. ESTER APODACA,
SGT. f/n/u REED, SGT. LORENZO SILVA,
SHEILA NUNEZ, CPL. DAVID FAIRCLAW,
LT. DAVID GARCIA and SGT. MARIA
TRUJILLO of the CHAVES COUNTY
DETENTION CENTER,

  **Defendants.**

## MEMORANDUM OPINION AND ORDER

  Plaintiffs have sued Chaves County, the County Manager, a County administrator, and several Chaves County Detention Center employees for various claims arising during Plaintiffs' employment at the Detention Center. Plaintiffs are women who allege that Defendants made their work environment hostile, and that Defendants retaliated against Plaintiffs for engaging in protected conduct in violation of Title VII. Doc. No. 23 at 14-15. Plaintiffs further allege that Defendants violated Plaintiffs' First Amendment right to speak freely, their Fourteenth Amendment rights to procedural and substantive due process, and equal protection of the laws. Doc. No. 23 at 11-13. Additional alleged theories of liability in Plaintiffs' Second Amended Complaint, such as claims under the Americans with Disabilities Act and for prima facie tort, have been dismissed. Doc. No. 42 at 1. Plaintiffs have also explained that they do not intend to pursue

other alleged legal theories, such as a Title VII disparate treatment claim. Id. at 1-2.

On May 2, 2001, Defendants filed a motion for summary judgment (Doc. No. 30) as to all claims. That motion will be granted in part and denied in part.

## I.    Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. Id. To withstand a motion for summary judgment, the non-movant must make "specific reference" to evidence in the record. Gross v. Burggraf Const. Co., 53 F.3d 1531, 1546 (10th Cir. 1995); D.N.M. LR-Civ. 56.1(b) (placing similar burden on both parties). Unsubstantiated allegations, no matter how true they might be, cannot be considered. Gross, 53 F.3d at 1546. It is not the Court's duty to comb the record for facts in support of an allegation, although the

Court may elect to do so.  <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 672 (10th Cir. 1998).[1]

## II.    Discussion

Alarmingly often, Plaintiffs' responses to Defendants' motion for summary judgment lack evidentiary citations or cite to non-specified portions of lengthy exhibits or to non-existent attachments.  Defendants urge that these response be disregarded.  Defs.' Reply at 3-4, 9.  As just noted, it is indeed the non-movants' burden at this stage to do more than have their counsel make assertions in a brief.  Thus, where Defendants have objected, I have generally declined to search the record for evidence to support claims by Plaintiffs for which no citation is provided.

### A.    Title VII hostile work environment

For Plaintiffs' hostile work environment claim to survive summary judgment, Plaintiffs must show "that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment."  <u>Penry v. Federal Home Loan Bank of Topeka</u>, 155 F.3d 1257, 1261 (10th Cir. 1998).  As the word "environment" suggests, incidents of discriminatory behavior should not be examined in isolation.  <u>O'Shea v. Yellow Technology Servs.</u>, 185 F.3d 1093, 1097 (10th Cir. 1999).  Accordingly, "[f]acially neutral abusive conduct" should be considered in evaluating whether Plaintiffs were subjected to a pervasive or severe sexually harassing hostile work environment.  <u>Id.</u>  All circumstances should be considered, including the frequency of the conduct, its severity, whether it is physically

---

[1] Local Rules also restrict exhibits to no more than fifty pages, except upon mutual agreement.  D.N.M. LR-Civ. 10.5.  Each party exceeded this limit by a wide margin.  There is no indication of an agreement to extend the page limit and neither party sought leave to do so.  Consequently, both parties are in violation of this rule.  Local Rules also restrict response briefs to twenty-four pages.  D.N.M. LR-Civ. 7.7.  Plaintiffs violated this rule by ten pages.

threatening or humiliating or merely offensive, and whether it unreasonably interferes with Plaintiffs' work.  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998).  Of course, to survive summary judgment, Plaintiffs must still produce evidence that they were harassed because of their gender.  Penry, 155 F.3d at 1261; Trujillo v. University of Colorado Health Sciences Center, 157 F.3d 1211, 1214 (10th Cir. 1998).

Plaintiffs allege, without elaboration, that the "overtly sexual" incidents in this case are "the harassment claims filed by Perez and Andazola."  Pls.' Resp. at 19.  Although Plaintiffs leave the Court to guess what harassment claims raised allegations of overtly sexual conduct, it is fairly certain that Ms. Perez[2] has in mind an incident, which Ms. Perez reported to Defendant Corporal Fairclaw, regarding Officer Carrera.[3]  In May 1999 Ms. Perez was working in the maximum security unit with Officer Carrera, who was laughing with an inmate.  Pls.' Resp. Ex. A at 6. When Ms. Perez asked Officer Carrera what they were laughing about, Officer Carrera responded that the inmate wanted Ms. Perez to bend over so he could "jump [her] bones."  Id.  Later that morning, Officer Carrera approached Ms. Perez with his hands in his pockets and told her that he had something for her from Corporal Fairclaw.  Id. at 7.  She extended her hand, Officer Carrera grabbed it, put it on his crotch, then "flipped [her] off."  Id.  When recounting these events later that day to another officer, she began to cry.  Id. at 7-8.

---

[2] The record indicates in places that Ms. Perez now uses the surname Gonzales.  For the sake of simplicity, I will use only the name under which she filed suit.

[3] Ms. Perez did not sue Officer Carrera.

Ms. Andazola asserts in places other than page 19 of her brief that several times she made what could be construed as harassment claims. For instance, Ms. Andazola says that on December 8, 1999, she met with Defendant Quintana, the County Manager, to discuss treatment of female officers, and again on January 27, 2000, to discuss unspecified problems at the Detention Center. Pls.' Resp. at 5-7.[4] She does not explain what transpired at these meetings; thus I cannot discern from them examples of overtly sexual conduct. In combing the record, I have found only one instance of overtly sexual conduct with respect to Ms. Andazola, which is described in Defendants' Fact 23 (undisputed). Fact 23 states that Ms. Andazola complained to her supervisors that Defendant Sgt. Reed "stared inappropriately at her chest on one occasion." The cited testimony indicates that Defendant Sgt. Reed did this on July 21, 1999. Defs.' Mem. in Supp. of Summ. J. Ex. A at 46.

Ms. Andazola and Ms. Earnest also contend that a lack of bathroom breaks is evidence of a sexually discriminatory hostile work environment. Pls.' Resp. at 20. They tie the denial of bathroom breaks to overtly sexual conduct by pointing out that female officers "more often" work "control," where an officer cannot leave the post without being relieved by another officer. Id. I have scrutinized Plaintiffs' brief and the record, and I have found assertions by Ms. Andazola and Ms. Earnest that they were denied bathroom breaks. Pls' Ex. B at 50-52; Pls' Ex. C at 64-65, 227-28. However, the contention that female officers staffed "control" positions "more often" is not backed by any citation to the record. Pls.' Resp. at 20. In combing the record to find support for this proposition, I have instead found Ms. Andazola's testimony that men, not women, spend

---

[4] The allegation about meeting with Defendant Quintana in January 2000 is purportedly supported by an exhibit which is not attached to Plaintiffs' Response. Pls.' Resp. at 6-7 (citing non-existent Exhibit H).

more time working "control."  Pls.' Resp. Ex. C at 98-99, 227.  At most then, the allegation about a lack of bathroom breaks is an example of facially neutral conduct.

As another apparent example of facially neutral but discriminatory conduct, Ms. Earnest contends that she was subjected to sexual harassment (and also retaliation) when the Detention Center "refus[ed] to adjust inmate supervision" after Ms. Earnest requested accommodation. Pls.' Resp. at 4.  Apparently Ms. Earnest's son had testified against an inmate (Anthony Garcia) and the brother (Vincent Vasquez) of another inmate (Paul Vasquez).  Pls.' Resp. Ex. B at 22, 67. Reviewing the record, I discovered evidence to support the assertion that Ms. Earnest's duties included guarding Anthony Garcia and Paul Vasquez.  Pls.' Resp. Ex. B at 67.   There is also evidence that on December 3, 1999, some inmates assaulted Ms. Earnest with food trays.[5] However, there appears to be no support for the claims that Defendants refused to adjust Ms. Earnest's supervision responsibilities, Pls.' Resp. at 4, that Ms. Earnest requested not to supervise certain inmates, id. at 4, or that Defendants forced her to supervise certain inmates, id. at 5, 20, 21, 28.  Certainly, Ms. Earnest does not call the Court's attention to any such evidence; each of these assertions lacks a citation to supporting evidence in the record.  To the contrary, Ms. Earnest cites to testimony that she never asked to avoid Paul Vasquez, which undermines her position.  Id. at 4 (citing Pls.' Resp. Ex. F at 15).  The record reveals testimony by Ms. Earnest that guarding Anthony Garcia "sometimes" made her "uncomfortable," Pls..'Resp. Ex. B at 66, and that a day or two after some inmates assaulted her she felt "real nervous" and could "barely

---

[5] Plaintiffs assert that Paul Vasquez and three others were responsible, Pls.' Resp. at 4, although the cited testimony identifies only Anthony or Michael Garcia, Pls' Ex. B at 16-17.  No testimony or undisputed fact indicates when this assault took place.  Plaintiffs allege in their Second Amended Complaint, Doc. No. 23 at ¶ 28, and in their brief, Pls.' Resp. at 4, that it occurred on or about December 3, 1999.

function," id. at 25. Ms. Earnest's testimony also suggests that one of the primary concerns of the District Attorney and Ms. Earnest's supervisor was whether Ms. Earnest could be impartial to those inmates who had threatened her. Id. at 67-69. Ms. Earnest seemed to have shared this concern. Id. at 68-69.

Ms. Earnest also believes she was sexually harassed because male officers who witnessed the food-tray assault did not testify against the inmate assailants, Pls.' Resp. Ex. B at 62, and because, after the assailants were sentenced and convicted, one was made a trustee, id. at 34. Pls.' Resp. at 20-21. Ms. Earnest further asserts (or rather, Ms. Andazola asserts on Ms. Earnest's behalf) that Ms. Earnest was locked in with maximum security inmates due to a mishandling of the doors. Pls.' Resp. at 21 & Ex. C at 220. Finally, Ms. Earnest contends, as evidence that her work environment was hostile to her because of her gender, that she was subjected to groundless discipline. Pls.' Resp. at 21.[6]

Having reviewed, in a light most favorable to Plaintiffs, all of the conduct which Plaintiffs describe as sexually discriminatory, Pls.' Resp. at 17-20, I find that no rational jury could conclude that the work environment for Ms. Andazola and Ms. Earnest was permeated with severe or pervasive sexual discrimination. Ms. Andazola was subjected to one overtly sexual, but isolated, incident. That incident—a male Sergeant staring at her chest—is similar to one in Penry, 155 F.3d at 1263. Yet, in Penry the chest staring was accompanied by a long list of other "gender-based" or "gender-related" conduct. The Court of Appeals ruled in Penry that chest staring combined with additional gender based conduct did not constitute a hostile work

---

[6] Ms. Earnest first presents evidence of what she considers to be unjustified disciplinary action in exhibits 3 and 5 of a supplemental letter brief to the Court dated July 10, 2001.

environment. The facts concerning Ms. Andazola are much less severe than those in Penry.

There is an even wider gulf between the severity of the conduct in Penry and the treatment of Ms. Earnest. Ms. Earnest experienced no overtly sexual incidents.[7] When all of the circumstances (overtly sexual and facially neutral) in which Ms. Andazola and Ms. Earnest found themselves at the Detention Center are viewed in a light most favorable to them, it is apparent that no reasonable jury could conclude that they were subjected to pervasive or severe discrimination in their workplace environment or that any harassment was sexual or stemmed from gender animus.

Ms. Perez' work environment was distinctly different. She was subjected to two rather extreme, overtly sexual incidents on the same day. No employee should have to tolerate a co-worker's crude sexual comments followed by his objectionable sexual contact. Cf. Gross, 53 F.3d at 1538 (evaluating female construction worker's sexually hostile work environment claim in light of "blue collar environment where crude language is commonly used by male and female employees," observing that "[s]peech that might be offensive or unacceptable in a prep school faculty meeting, or on the floor of Congress, is tolerated in other work environments").

Further, Ms. Perez argues a negligence theory of employer liability, whereby Chaves County could be liable if the County failed to remedy a hostile work environment about which it knew or should have known. Hollins v. Delta Airlines, 238 F.3d 1255, 1258 (10th Cir. 2001).

---

[7] Ms. Andazola seems to think that Ms. Earnest was sexually harassed when, on August 16, 1999, Officer Baldonado, a man, lifted Ms. Earnest off the ground. Even if Ms. Earnest shares that view with respect to this brand-new factual allegation, never made in the pleadings and first mentioned in exhibit 2 of Plaintiffs letter brief dated July 10, 2001, the Court does not; the exhibit has no description of fondling or inappropriate touching or related sexually suggestive comments. Even if the allegation about Officer Baldonado were somehow gender-based or gender-related, it would not alter the result of Ms. Earnest's sexually hostile work environment claim.

"Thus, the focus is not on whether the employer is liable for the bad acts of others, but whether the employer itself is responsible for failing to intervene." Id. By stipulation and order, Chaves County remains as the sole Defendant to Plaintiffs' Title VII claims.

Generally, officers (like Ms. Perez) report to Sergeants who report to Lieutenants who report to Captains who report to the Administrator of the facility. Defs' Mem. in Supp. of Summ. J. Fact 2 (undisputed). Ms. Perez' argues that Chaves County knew about her hostile work environment because she complained to various people above her in the chain of command, including Sergeants and a Captain. Pls.' Resp. at 22. Chaves County does not address when knowledge can be imputed to the County as Ms. Perez' employer. Chaves County simply contends that it was not negligent because it intervened adequately and that it is entitled to judgement based on the Burlington-Faragher defense. Defs.' Mem. in Supp. of Summ. J. at 18-19.

Officer Carrera was disciplined, but only for the comment he made to Ms. Perez, and not for placing Ms. Perez' hand on his crotch, the more extreme conduct. Id. Fact 98 (undisputed). Nevertheless Chaves County believes that its response was reasonable because neither incident recurred. I might be inclined to agree with Chaves County if the gender-based conduct had ceased entirely. The record reveals, however, that the gender based conduct assumed a new form and spread to other perpetrators. Ms. Perez testified that after the incidents with Officer Carrera, other people (including a Sergeant) repeatedly made comments to Ms. Perez or in her presence about how she should be avoided because she might make a sexual harassment complaint. Pls.'

Resp. Ex. A at 9-10.[8]  Ms. Perez also testified that when she would enter a room in which an anti-sexual discrimination sign was displayed, other people in the room would turn around and point to it, as if reminding one another not to speak to her.  Id. at 34.  Ms. Perez further testified that she made Defendant Sgt. Trujillo, id. at 11, and perhaps Defendant Sgt. Reed, id. at 35, aware of the gender-related or gender-motivated remarks and gestures by co-workers and supervisors.  Still, the behavior persisted and Chaves County took no action.  Id. at 10.  While there may be circumstances in which inaction is an adequate response, this is not such a case.  Moreover, Ms. Perez' reasonable attempts to prevent this behavior, by making Sergeants aware of it, preclude summary judgment in favor of Defendant Chaves County based on the Burlington-Faragher defense.  Accordingly, Ms. Perez' claim that she worked in a sexually harassing environment may be presented to a jury.

**B.     Title VII retaliation**

To survive summary judgment, each Plaintiff must establish a prima facie case:  she engaged in protected conduct; she was subjected to an adverse action; and, a causal connection exists between the two.  McCue v. Kansas Dept. of Human Resources, 165 F.3d 784, 789 (10th Cir. 1999).  Defendants assert that no Plaintiff has demonstrated any element of a  prima facie retaliation case.  Defs.' Mem. in Supp. of Summ. J. at 19.  To the contrary, each Plaintiff engaged in at least one instance of protected conduct, and in some instances, every element of a prima

---

[8] Ms. Perez also testified that Officer Carrera made similar comments to others. Defendants object to this testimony because Ms. Perez lacks personal knowledge that such statements were made.  Defs.' Reply at 5.  I agree and have thus not considered it.  Nonetheless, Ms. Perez has met her summary judgment burden with respect to her hostile work environment claim without the inadmissible evidence.

facie case has been established.[9]

Ms. Perez contends that she engaged in protected conduct four times. Pls.' Resp. at 26; Pls' Ltr. Br. at unnum. p. 6, dated July 10, 2001.[10] Two of these (a report and an EEOC complaint in January and February 2000) occurred after Ms. Perez' employment with Chaves County ended. Ms. Perez does not indicate in her response brief or in her supplemental brief that any adverse employment action followed those two actions. Id. at 7-8. Thus, Ms. Perez' actions of protected conduct that occurred after she ceased working at the Detention Center cannot support a retaliation claim.[11]

The third instance of Ms. Perez' protected conduct was her complaint to Defendant Cpl. Fairclaw about the May 1999 incident with Officer Carrera. Pls.' Resp. Ex. A at 8, 18. Ms. Perez' complaint about Officer Carrera appeared to prompt Defendant Truelock, the County Administrator, to call a meeting at which he informed Ms. Perez that he was moving her to the

_____

[9] Chaves County restrictively views what constitutes opposition to an unlawful employment practice under the anti-retaliation statute, 42 U.S.C. § 2000e-3(a). Defs.' Mem. in Supp. of Summ. J. at 19. The "participation clause" of section 2000e-3(a) bars retaliation for participation in Title VII proceedings. 2 Lex K. Larson, Employment Discrimination, §§ 34.02-03 (2d ed. 2001). But contrary to Defendants' argument, the "opposition clause" is "far wider" than the "participation clause" and is not restricted only to opposition to Title VII proceedings. Id. § 34.03.

[10] Plaintiffs' Response listed six different actions of protected conduct, although each did not apply to all Plaintiffs in every instance. Pls.' Resp. at 26. In a letter dated June 18, 2001, the Court requested clarification of Plaintiffs' retaliation claims (1) because it was unclear when each instance of protected conduct took place, (2) because it was unclear which adverse actions they triggered, and (3) because Plaintiffs appeared to describe elsewhere in their brief additional protected conduct which they did not list on page 26 of their response. In analyzing all retaliation claims, I have assumed Plaintiffs' argument on pages 26-29 of their response and their July 10, 2001, letter to be an exhaustive description of the retaliation claims in this case.

[11] At the June 13, 2001, pretrial conference, Ms. Perez' counsel conceeded that the EEOC charge would "obviously not" support a claim of retaliation. Tr. at 42.

night shift, i.e., the midnight to 8:00 a.m. shift.  Id. at 19-20.  It is unclear which hours Ms. Perez

worked on the date Officer Carrera molested her.  However, given that I am bound to define the

term "adverse employment action" liberally, Jeffries v. Kansas, 147 F.3d 1220, 1232 (10th Cir.

1998), I find that being moved from any other shift to the graveyard shift sufficiently altered the

terms and conditions of Ms. Perez' employment, making the move an adverse action.  The

adverseness of the shift change is underscored by Ms. Perez' disclosure that she had to drop

classes as a result, even after receiving an assurance that Defendant Lt. Garcia would

accommodate her college schedule.  Pls.' Resp. Ex. A at 19-20.  Ms. Perez has shown a causal

relationship by pointing out that the purpose of the meeting at which Defendant Truelock

announced Ms. Perez' schedule change was to address the incident between Officer Carrera and

Ms. Perez.  Consequently, Ms. Perez fully established her prima facie case of retaliation based on

her complaint about the May 1999 incident with Officer Carrera.[12]

In addition to the shift change, Ms. Perez' complaint about Officer Carrera precipitated

co-worker and supervisory hostility and harassment.  The hostility and harassment included

comments and gestures designed to warn others in Ms. Perez' presence that they risked being

accused of sexual harassment when interacting with her.  Pls.' Resp. Ex. A at 9-11; 34-35.  In

Gunnell v. Utah Valley State College, 152 F.3d 1253, 1264 (10th Cir. 1998), the Tenth Circuit

Court of Appeals recognized a cause of action for retaliation against employers for "co-worker

hostility or retaliatory harassment," depending on its severity and the culpability of the employer.

---

[12]  There is evidence that Ms. Perez' shift was changed because the Detention Center was
moving all its employees to 12 hour shifts.  Oddly, it is Plaintiffs who call this fact to the Court's
attention.  Pls.' Resp. at 9 (citing testimony by Apodaca and Garcia).  However, Defendants
restrict their argument to Plaintiffs' alleged lack of a prima facie case and never make an explicit
argument that Ms. Perez' shift was changed for a legitimate business reason.

The harassment here (1) occurred daily for a period of about six months, (2) came from co-workers and supervisors, and (3) eventually drove Ms. Perez to attempt to resign.[13]  Pls' Resp. Ex. A at 9-11, 35.  Collectively, the harassing comments and gestures amounted to more than mere rudeness or ordinary workplace tribulation; the severity of the behavior could justify a jury finding adverse employment action for purposes of a retaliation claim.  Gunnell, 152 F.3d at 1265.

Chaves County asserts that it did not condone or encourage the conduct directed to Ms. Perez at work.  Defs.' Reply at 7.  Chaves County ignores the evidence that hostility or harassment was directed toward Ms. Perez by officers higher in the chain of command, i.e., Sergeants, as well as co-workers. Likewise, Chaves County ignores the argument that Sergeants' conduct could impute liability to Chaves County.  Sergeants are at least one step up the chain of command from Officers, Defs.' Mem. in Supp. for Mot. for Summ. J. Fact 2 (undisputed), and there is evidence that Corporals and Sergeants are supervisors.  Id. Ex. A at 70.  Construing the evidence in a light most favorable to Ms. Perez, as I must, and in the absence of any contrary argument, I find that "supervisory or management personnel either (1) orchestrate[d] the harassment or (2) knew about the harassment and acquiese[d] in it in such a manner as to condone and encourage it."  Gunnell, 152 F.3d at 1265.  Therefore, a reasonable jury could find Chaves County liable for any retaliation Ms. Perez encountered, making summary judgment in favor of the County inappropriate.

Ms. Perez' final allegation of protected conduct is shared with actions by Ms. Andazola

_____

[13] Ms. Perez apparently attempted to resign because of "pressure from the comments," by way of a letter that apparently outlined her negative experiences at the Detention Center.  Pls' Resp. Ex. A at 11-14.  Ms. Perez testified that Defendant Lt. Garcia told her he would not give her a good recommendation if she quit like that, without a "good" resignation letter.  Id. at 13. This caused her to withdraw her resignation for the time being.  Id. at 13-14.

and Ms. Earnest. Apparently, on December 8, 1999, all three Plaintiffs went to Defendant Quintana to report discrimination and harassment. Pls.' Ltr. Br. at unnum. pp. 6-7, dated July 10, 2001; Pls.' Resp. at 26. In a letter to counsel on June 18, 2001, I asked Plaintiffs to explain which retaliatory acts flowed from each instance of protected conduct. All Plaintiffs apparently believe that their December 8, 1999, meeting with Defendant Quintana resulted in a denial of breaks. Pls.' Ltr. Br. at unnum. p. 7, dated July 10, 2001 (Ms. Andazola and Ms. Earnest only); Pls.' Resp. at 27-28 (all three Plaintiffs). Additionally, Ms. Andazola believes that the December meeting with Defendant Quintana resulted in "several incidents in which facility doors were [operated] inappropriately, exposing [Ms. Earnest] to danger." Pls.' Ltr. Br. at unnum. p. 7, dated July 10, 2001 (citing Pls.' Resp. Ex. C at 220-21; 226-27).

There is little indication as to when the door mishandling Ms. Andazola complains about occurred. Plaintiffs assert that it took place "[f]ollowing" the December 8, 1999, meeting with Defendant Quintana. Certainly a temporal relationship can, with sufficient specificity, give rise to an inference of causation. O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1252 (10th Cir. 2001). But the only temporal relationship to which Ms. Earnest points, by using "following," is the "logical fallacy" of *post hoc ergo propter hoc*. Sunward Corp. v. Dun & Bradstreet, Inc., 811 F.2d 511, 521 n. 8 (10th Cir. 1987). More importantly, Ms. Andazola's testimony suggests that door mishandling around Ms. Earnest was actually a topic—not a result—of the December 8, 1999, meeting (or perhaps an earlier one). Counsel asked Ms. Andazola if she or others brought up safety issues at the "first" meeting with Defendant Quintana, to which Ms. Andazola responded affirmatively. Pls' Resp. Ex. C at 225-26. When asked to elaborate, Ms. Andazola described how doors had been improperly operated around Ms. Earnest. Obviously, this

testimony, even when viewed in a light most favorable to Plaintiffs, undermines any causal inference.[14]

With respect to breaks, Ms. Perez testified that she was denied them "when" the Detention Center moved from 8 to 12 hour shifts. Defs.' Mem. in Supp. of Summ. J. Fact 104 (undisputed) (implying that the shift change was the reason for the loss of breaks, not explaining why the new schedule would require curtailing of breaks). There is also evidence that all three Plaintiffs' concern about insufficient breaks was actually a topic—not a result—of a meeting the three had with Defendant Quintana. Pls.' Resp. Ex. A. at 48. Unfortunately, the date at which the Detention Center moved its employees to 12 hour shifts is not provided. It is similarly unclear whether Ms. Perez testified that Plaintiffs complained about breaks at the December 8, 1999, meeting or at a different one. However, Ms. Andazola did testify that the lack of breaks began "[r]ight after we" met with Defendant Quintana. Pls.' Resp. Ex. C at 69 (stating that only she and Ms. Earnest had been denied breaks). Construing these allegations in a light most favorable to Plaintiffs, I find that Plaintiffs have, barely, demonstrated a prima facie case as to causation concerning denial of breaks.[15]

Chaves County's argues that insufficient bathroom breaks do not constitute an adverse employment action. Chaves County relies on three cases, all of which are distinguishable. In one, the court found that the plaintiffs bathroom breaks were only delayed, not denied, and that the

---

[14] Plaintiffs have not made the Court's aware of any testimony that Ms. Earnest personally felt the mishandling of doors was retaliation.

[15] Because the parties failed to inform the Court of the times when so many important events occurred, and because the issue of timing bears directly on causation, I will expect counsel to establish in the first instance at trial when each relevant event occurred.

delays were not caused by discrimination.  Harrington v. Boysville of Michigan, Inc., No. 97-1862, 1998 WL 252755, at **4 (6th Cir. May 13, 1998).  In another, the court concluded that the plaintiffs were not retaliated against when they were no longer permitted to take breaks together after they filed an EEOC complaint.  Walker v. Thompson, 214 F.3d 615, 629 (5th Cir. 2000).  In the third case, the court found that a delayed bathroom break, which caused the plaintiff who was menstruating to bleed on her overalls, did not give rise to a sexually hostile work environment.  Weiland v. Department of Transp., 98 F. Supp. 2d 1010, 1019 (N.D. Ind. 2000).

Similar to the plaintiff in Weiland, Ms. Earnest at one point wet herself after not receiving a timely break.  Pls.' Resp. Ex. B at 53.  Ms. Andazola testified that the lack of bathroom breaks aggravated a medical condition she had, which forced her to wear a Maxi Pad.  Pls.' Resp. Ex. C at 227.  Moreover, there is evidence that Ms. Earnest and Ms. Andazola consistently did not receive bathroom breaks or breaks to eat during eight or even twelve hour shifts, Pls.' Resp. Ex. B at 51-53 & Ex. C at 227-28, making the facts here more extreme than the one-time incident in Weiland.  The law in this Circuit is to assess allegations of adverse action in a liberal manner.  Jeffries, 147 F.3d at 1232.  Using the restroom and eating are fundamental needs, and to be denied repeatedly these activities, temporarily or otherwise, is more than a "mere inconvenience."  Sanchez v. Denver Pub. Schs., 164 F.3d 527, 531 (10th Cir. 1998) (citations omitted).  I therefore conclude that under the facts here the delay or denial of bathroom breaks amounts to an adverse employment action.

Ms. Perez also contends that Chaves County took an adverse action against her when she was denied leave to attend her sister's October 21, 1999, wedding and her own December 19, 1999, college graduation, apparently as some sort of cumulative retaliation that resulted from all

the protected conduct that predated those events. Pls.' Ltr. Br. at unnum. p. 7, dated July 10, 2001. Although neither party offers any case law or analysis as to whether denial of leave requests is an adverse action, I find that in this case it is not. While refusing leave to attend these events would be understandably annoying and disappointing, the denials did not significantly change Ms. Perez' employment status or benefits, or cause anything more than an inconvenience. Sanchez, 164 F.3d at 531. Thus, they cannot support a retaliation claim.

Ms. Andazola contends that Chaves County took two other allegedly retaliatory adverse actions against her (in addition to the denial of breaks already discussed) when she was "denied (1) medical leave and (2) the opportunity for light duty in November of 1999 and January 2000." Pls' Ltr. Br. at unnum. p. 7, dated July 10, 2001 (citing Pls.' Resp. Ex. C at 95).[16] Ms. Andazola seems to contend that these actions were caused by the July 1999 complaint she made against Defendant Sgt. Reed. for staring at her chest and what she said during her December 1999 meeting with Defendant Quintana. Id. She also felt subject to retaliation for filing a report on August 16, 1999, against Officer Baldonado, for, in her view, Officer Baldonado's inappropriate touching of Ms. Earnest in a manner that offended Ms. Andazola. Id. Ex. 2.

This factual allegation about being denied "the opportunity for" light duty is new to the case, emerging for the first time in Plaintiffs' response. Compare Doc. No. 23 at ¶¶ 24-25 with Pls.' Resp. at 6. While Ms. Andazola did testify at her deposition about an alleged denial of light duty, she never moved to amend her Second Amended Complaint to assert this as a retaliation

---

[16] The cited testimony actually refers to defense counsel's question as to what might have caused any delay between surgeries in November 1999 and January 2000, if indeed Ms. Andazola had operations on those two dates. Although Ms. Andazola demonstrated a keen recollection of how much time male colleagues were on light duty, she repeatedly testified that she could not remember when she had her two surgeries. Pls.' Resp. Ex. C at 78-79, 96-99.

claim. But even if Ms. Andazola had properly plead the claim, it would be denied for two alternative reasons. First, even construing the testimony in a light most favorable to Ms. Andazola, she suffered no adverse action because she was given light duty for the maximum period allowed. Pls.' Resp. Ex. C at 96. Second, even if male employees were able to exceed the Detention Center's policy of granting light duty for only four weeks, whereas Ms. Andazola was not, this discrepancy simply caused her to take advantage of the Family and Medical Leave Act. Id. at 95-96. The circumstances here do not rise to the level of an adverse action.

To the extent the allegation on unnumbered page 7 of Ms. Andazola's letter brief of July 10, 2001, is meant to encompass the allegation(s) which she makes in paragraph 25 of her Second Amended Complaint (Doc. No. 23), summary judgment as to this (or these) claims will still be granted. Ms. Andazola first states in paragraph 25 that on "January 6, 1000 [sic]," she was told by a doctor that she needed knee surgery. She claims that Defendant Apodaca and Defendant Garcia then told her that she could not have any time off and that Defendant Nunez told her to lie to her doctor so that the doctor would no longer restrict her to light duty. She next asserts that, although she had been requesting "this" medical leave for a year, on January 24, 2000, she took medical leave without pay to have the surgery done. She asserts that the one-year delay caused her severe physical pain, and that male officers in similar situations have been given medical leave.

Despite all of Ms. Andazola's assertions, none of them, except those about the doctor's diagnosis and male officers' medical leave, are accompanied with citations to evidence. Id. The allegations about male officers are followed by a citation to a deposition page that Ms. Andazola did not attach to her brief. Id. Ms. Andazola points to no evidence that Defendant Nunez' alleged coercion ever cause Ms. Andazola to lie. Ms. Andazola points to no evidence that she

was denied medical leave or that she suffered undue pain because her surgery was delayed a year. Indeed, the factual allegations in her brief suggest that she did receive leave to have her surgery and that she had to wait less than three weeks for it. Compounding the evidentiary problems, Ms. Andazola never makes any argument as to how these allegations rise to the level of an adverse employment action. In sum, Ms. Andazola has not pointed to evidence in response to Defendants' motion for summary judgment that justifies submitting the allegations in paragraph 25 of her Second Amended Complaint to a jury.

Ms. Earnest contends that Chaves County retaliated against her individually in several ways (in addition to denying her breaks) in response to several instances of protected opposition to discrimination. In her July 10, 2001, letter brief, Ms. Earnest claims that she reported "the incident of August 16, 1999" in which Officer Baldonado hugged her. Then she states that "[f]ollowing this incident" she complained of receiving death threats from "two inmates" but no action was taken. Pls.' Ltr. Br. at unnum. p. 7 (citing Pls.' Resp. Ex. B) (not indicating, by name, the inmates). There are many problems with this allegedly retaliatory chain of events, not the least of which is that it is new to the case. Nowhere in her Second Amended Complaint or even her response to Defendants' motion for summary judgment does Ms. Earnest mention what she now calls "the incident of August 16, 1999," or otherwise complain of inappropriate touching by Officer Baldonado.

The record does not support Ms. Earnest's assertion that after the hugging incident she reported Officer Baldinado, which would be protected conduct under Title VII. 42 U.S.C. § 2000e-3(a). When Ms. Earnest claims that she reported "the incident of August 16, 1999," Pls.' Ltr. Br. at unnum. p. 7, dated July 10, 2001, she distorts the facts. The only evidence to which

she points in support is a letter (or memo) dated August 16, 1999, sent by Ms. Andazola, not Ms.

Earnest, to Officer Hale describing how Officer Baldonado lifted Ms. Earnest off the ground.  It

could conceivably serve as evidence that Ms. Earnest had engaged in protected conduct if perhaps

it contained some sort of indication that Ms. Earnest had opposed an employment practice made

unlawful by Title VII.  However, Ms. Andazola's complaint to Officer Hale just states that Ms.

Earnest told Officer Baldonado she was not happy with him, that Ms. Earnest accepted his

subsequent apology and apparently dropped the matter.  This might constitute evidence of

opposition to an allegedly unlawful employment practice on Ms. Andazola's part, McKenzie v.

Renberg, Inc., 94 F.3d 1478, 1486 n. 8 (10th Cir. 1996), but not on Ms. Earnest's, Metzger v.

City of Leawood, 144 F.Supp.2d 1225, 1257 n. 38 (D. Kan. 2001).

Further, Ms. Earnest's allegation that "no action was taken" with respect to her guarding

two inmates who threatened her is problematic because Ms. Earnest has never pointed to

evidence that she asked not to guard the threatening inmates.  Supra 5-6.  I also have reservations

about whether requiring her to continue to guard two inmates who had threatened her is, in this

case, an adverse employment action.  After all, Ms. Earnest is a prison guard.  As she testified,

that job carries "an accepted risk."  Pls.' Resp. Ex. B at 69.  Another problem with the allegation

about having to guard two threatening inmates is the apparent lack of a causal connection.  In

spite of the Court's letter of June 18, 2001, admonishing counsel to link each act of alleged

retaliation to specific protected conduct, Ms. Earnest states in her subsequent letter brief only that

she engaged in protected opposition to an unlawful employment practice and "[f]ollowing this

incident" she had to guard two threatening inmates.  As I have already observed, this imprecise

description of the sequence of events does nothing to establish a causal connection.

The next two incidents in Ms. Earnest's list of retaliatory events suffer from similar defects. Ms. Earnest claims, with factual allegations not made in her Second Amended Complaint, that in October 1999 she received a formal, written reprimand, and on November 15, 1999, she received a letter of concern. Pls.' Ltr. Br. at unnum. p. 7, dated July 10, 2001. The only conduct which clearly preceded the October and November documents though was Ms. Andazola's August 16, 1999, correspondence to Officer Hale. As already explained, this cannot be construed as Ms. Earnest's protected conduct. Alternatively, Ms. Earnest implies that her complaints about inmates, presumably before October 1999, are forms of conduct protected under Title VII. Once again, Ms. Earnest's testimony raises much doubt about whether she ever "complained" about inmate threats, as opposed to simply making her supervisors aware of them. But even if she did complain, this is not the sort of complaint which Title VII protects. Any objection Ms. Earnest had expressed about guarding certain inmates, as far as Defendants knew at the time, addressed only her safety or her ability to guard these inmates, and not discrimination based on sex, race, color, religion, or national origin.[17] 42 U.S.C. § 2000e-2(a). Clearly, no protected conduct preceded the October 1999 and November 1999 documents.[18] Thus, the

_____

[17] Plaintiffs now assert Ms. Earnest suffered dissimilar treatment when she had to guard threatening inmates. Pls.' Lt. Br. at unnum. p. 2, dated July 10, 2001. Ms. Earnest made no such disparate treatment claim at the relevant time and thus cannot now convert her communication to her superiors into protected opposition to sex discrimination.

[18] There is evidence that Ms. Earnest felt that she was the victim of sexual discrimination when the inmates who threatened her and eventually assaulted her with food trays were not dealt with as harshly as inmates who had assaulted men or Ms. Earnest's female supervisor. Pls' Ex. B at 36-37. Even if Ms. Earnest had complained about this as sexual discrimination, such a complaint could not have caused the October and November disciplinary documents. The food tray assault did not occur until December 3, 1999, Doc. No. 23 at ¶ 28; Pls.' Resp. at 4, after the letters of reprimand were written.

written reprimand and the letter of concern cannot support a retaliation claim.

The final claim of retaliatory conduct is based on Ms. Earnest's allegation that in 2001 she had to take stress leave following her supervision of Vincent Vasquez after he made death threats against her. Pls.' Ltr. Br. at unnum. p. 7, dated July 10, 2001.[19] Ms. Earnest previously had made a stronger allegation that she was forced to supervise Vincent Vasquez. Pls.' Resp. at 5. Defendants objected to that allegation as being unsubstantiated. Defs.' Reply at 9. Indeed, Ms. Earnest's assertion that she was forced to guard Vincent Vasquez conspicuously lacks a citation to evidence in the record. To the contrary, the surrounding citations undermine her claim. Ms. Earnest cites to testimony by Defendant Lt. Garcia that specifically refutes her claim that guarding Vincent Vasquez caused Ms. Earnest's stress leave. Pls.' Resp. at 5 (citing Pls.' Ex. E at 49). Ms. Earnest then cites her own non-existent affidavit. Id. Plaintiffs' letter brief follows a familiar pattern in that Ms. Earnest's assertion about Vincent Vasquez is without reference to any evidence. Pls.' Ltr. Br. at unnum. p. 7, dated July 10, 2001. "To withstand a motion for summary judgment, the nonmovant must do more than refer to allegations of counsel contained in a brief." Gross, 53 F.3d at 1546. The allegations about being responsible for guarding or being forced to guard Vincent Vasquez in 2001 do not satisfy Ms. Earnest's obligation to point to evidence that creates a genuine issue of material fact.

## C.  First Amendment retaliation

Ms. Perez and Ms. Andazola contend that they were retaliated against when they filed sexual harassment complaints in 1998 and again in 1999. Pls.' Resp. at 29. Ms. Perez may have

---

[19] The protected conduct most close in time which Ms. Earnest describes is a meeting with Defendant Quintana over one year before. Pls.' Ltr. Br. at unnum p. 7. The alleged causal link is thus, again, quite tenuous.

in mind the incident regarding Officer Carrera which she reported to a Corporal, as described on page 2 of her brief opposing summary judgment. There does not appear to be any evidence that Ms. Andazola brought a sexual harassment complaint in 1998. All three Plaintiffs further maintain that they were retaliated against because they complained to Defendant Quintana at an unspecified time about treatment of women at the Detention Center. Id. Plaintiffs appear to have in mind the December 8, 1999, meeting described on page 5 of their brief.[20]

The First Amendment protects Plaintiffs from retaliation in response to their speech only under specific conditions. First, the speech must have been on a matter of public concern. Paradis v. Montrose Mem. Hosp., 157 F.3d 815, 818 and n. 1 (10th Cir. 1998); Woodward v. City of Worland, 977 F.2d 1392, 1403 (10th Cir. 1992). If so, the Court must then balance Plaintiffs' interest in speaking against their employer's interest in efficiently serving the public. Paradis, 157 F.3d at 818 n. 1. Finally, the employees must show that their speech motivated their employer's retaliatory conduct. Id.

Here, Plaintiffs do not explain how Defendants retaliated against them. Pls.' Resp. at 29. Neither Plaintiffs nor Defendants address the balancing of their respective interests. The parties only address whether Plaintiffs engaged in speech about a matter of public concern. Plaintiffs contend that they intended to object to the treatment of all women at the Detention Center and not merely address their own personal grievances. Thus, Plaintiffs reason that they spoke on matters of public concern. The allegations which Plaintiffs make, even when viewed in a light

---

[20] Ms. Andazola asserts that on January 27, 2000, she met with Defendant Quintana and other Detention Center employees to discuss "problems," and that Ms. Andazola raised "the facility's hostile work environment." Pls.' Resp. at 6-7. The cited evidence either does not support the stated proposition (Pls.' Resp. Ex. B at 48-49) or does not exist (Pls.' Resp. Ex. H).

most favorable to them, do not support the assertion that Plaintiffs objected on December 8, 1999, to treatment of anyone other than themselves. Pls.' Resp. at 5 (citing Pls' Exs. A at 2-23, B at 47-49, & C at 225-26). Ms. Perez' and Ms. Andazola's vague (and, with respect to Ms. Andazola, unsubstantiated) allegations about complaints in 1998 and 1999 appear to be no different. That is, Plaintiffs spoke out merely in attempt to redress personal grievances. Paradis, 157 F.3d at 818. Accordingly, summary judgment will be granted as to Plaintiffs' First Amendment retaliation claim.

**D.     Due Process**

Plaintiffs' Count Two is entitled:

Violation of 42 U.S.C. § Section 1983
For Deprivation of Rights Protected by the Fourteenth
Amendment
Procedural and Substantive Due Process
Property and Liberty Interest

Under this heading Ms. Perez asserts a property interest in continued employment which was "violated" by her constructive discharge. Doc. No. 23 at ¶ 42. All Plaintiffs claim their liberty interests in their reputations were "damaged" in unspecified ways, in violation of their due process rights. Id.

In their motion for summary judgment Defendants assert that Plaintiffs' contentions are insufficient to support procedural or substantive due process claims. Defs.' Mem. in Supp. of Summ. J. at 23. Defendants state that Plaintiffs' procedural due process claim "is merely part of Plaintiffs' shot-gun approach to setting forth their claims, and thus, it should be discarded." Id. Defendants then aver that there "simply" is no deprivation of a property interest. Id. Defendants do not mention any liberty interest claim and never cite to any case law.

In response, Ms. Perez argues that she had a property interest in continued employment and that Defendants deprived her of it by constructively discharging her. Pls.' Resp. at 30. Plaintiffs then state:

> There is no reason why an employer should be free to force an employee to resign employment in retaliation for protected speech, and **[not?]** be subject to liability if a termination occurs.

Id. (Alteration by the Court). Finally, Ms. Andazola and Ms. Earnest (but not Ms. Perez) make the new allegation that their safety has been jeopardized through repeated retaliation and harassment. Id. Plaintiffs, like Defendants, do not indicate the legal standard by which any of the claims in Count Two should be measured. In reply, Defendants argue only that Ms. Perez was not constructively discharged.

This sequence illustrates highly questionable claims, some of which appear to be frivolous, followed by bad briefing, which leaves the Court in an awkward position of guessing at arguments and counter-arguments.

Although Ms. Andazola and Ms. Earnest may have a liberty interest in their safety, Ingraham v. Wright, 430 U.S. 651, 673 (1977), they never made this allegation in their Second Amended Complaint. Therefore, they cannot now pursue it.

All Plaintiffs (including Ms. Perez, who appears to be abandoning her claim) may also have a liberty interest in their reputations. But in order to prevail Plaintiffs must show that (1) Defendants made a statement "impugning their good name, reputation, honor, or integrity," (2) the statement was false, (3) Defendants made the statement in the course of termination proceedings or that it foreclosed future employment opportunities, and (4) the statement was published. Garcia v. City of Albuquerque, 232 F.3d 760, 772 (10th Cir. 2000). Plaintiffs have

not addressed what statements Defendants made impugning their reputations, or any other element of this claim. Pls.' Resp. at 30. Having combed the record, I find absolutely no evidence before the Court that Plaintiffs could meet their burden under Garcia with respect to their liberty interest in their reputations.

Ms. Perez also may have a property interest in continued employment. Compare Garcia, 232 F.3d at 769 with Clinger v. New Mexico Highlands University, Bd. of Regents, 215 F.3d 1162, 1167 (10th Cir. 2000). In order to pursue a substantive due process claim for deprivation of a property interest in her job, Ms. Perez must show that she was discharged for arbitrary and capricious reasons. Curtis v. Oklahoma City Public Schools Bd. of Educ., 147 F.3d 1200, 1215 (10th Cir. 1998). "Any substantive due process claim must represent more than an ordinary tort to be actionable under § 1983 and must shock the conscience," Clark v. City of Draper, 168 F.3d 1185, 1190 (10th Cir. 1999) (quotations and citations omitted), specifically, the conscience of "federal judges," Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992), or the "contemporary conscience," County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998).

Although it its far from clear, it appears Ms. Perez' argument is designed to persuade the Court that her constructive discharge is as actionable under the Fourteenth Amendment as an actual discharge. Assuming, without deciding, that Ms. Perez is correct on that point, I find she has failed to present evidence that has shocked my conscience or the contemporary conscience.

Plaintiffs also purport to bring a procedural due process claim. Here, the focus must be on whether the state actor used "fair procedures" in depriving a person of life, liberty, or property. Hennigh v. City of Shawnee, 155 F.3d 1249, 1253 (10th Cir. 1998). Defendants assert that no Plaintiff suffered any employment action which would trigger a constitutional obligation to afford

Plaintiffs procedural due process. Indeed this appears to be the case, and Plaintiffs have made no argument to the contrary. Accordingly, summary judgment will be granted as to Count Two in its entirety.

### E. Equal Protection Clause

In Count Three of their Second Amended Complaint, Plaintiffs claim that Defendants deprived them of their rights under the Equal Protection Clause because of Plaintiffs' sex. Doc. No. 23 at 13. To prevail on Count Three, Plaintiffs must demonstrate that they were treated differently than others similarly situated. Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 532 (10th Cir. 1998); Barney v. Pulsipher, 143 F.3d 1299, 1312 (10th Cir. 1998). Because Plaintiffs' Equal Protection Clause claim is based on sex or gender, Plaintiffs must demonstrate that Defendants treated similarly situated men more favorably.

In Section III of their Second Amended Complaint Plaintiffs allege dissimilar treatment. For instance, they assert that Defendants have dealt more harshly with inmates who assaulted male officers than with the inmates who assaulted Ms. Earnest, citing incidents "two years ago" and on December 30, 1999, in which inmates who assaulted Officers Gary Powell and Mike Chavez were sent to solitary confinement. Doc. No. 23 at 8. Plaintiffs make general, undetailed allegations of differential treatment in their Second Amended Complaint, e.g., id. at 4, 5, 6, and in their response, Pls.' Resp. at 6, 13, 15.

Defendants argue that Plaintiffs do not know how male officers were treated. Defs.' Mem. in Supp. of Summ. J. at 24 (contending that Plaintiffs "repeatedly stated" they do not know how male officers were treated, without citation to evidence). Plaintiffs respond by discussing points of equal protection law that are either not disputed, not relevant, or both, and then

conclude that they have "stated claims . . . as set out at length in the preceding pages" of their response. Pls.' Resp. at 30-31. In their response, Plaintiffs did not discuss a single fact which might support their Equal Protection claim. Because of this unhelpful briefing, in a letter to counsel dated June 18, 2001, I asked counsel to indicate, with precise citations to the record, every example of admissible evidence—as opposed to arguments or assertions by counsel or a deponent—of male correctional officers having received more favorable treatment than Plaintiffs or other female correctional officers received. This additional briefing was intended to probe whether Plaintiffs had any evidence whatsoever to support allegations of dissimilar treatment, including whether Defendants disciplined more harshly inmates who assaulted male, rather than female, officers, or whether any of Plaintiffs' general assertions about dissimilar treatment were true. Plaintiffs responded with a letter brief containing seven numbered instances of what they describe as "differential treatment." Pls.' Ltr. Br. at unnum. pp. 1-2, dated July 10, 2001.

To establish an equal protection claim Plaintiffs must demonstrate that they were "intentionally treated differently from others similarly situated." Bartell v. Aurora Public Schools, No. 00-1162, 2001 WL 984719 (10th Cir. Aug. 21, 2001). Here, Plaintiffs make no serious attempt to demonstrate that they were "treated differently than another who is similarly situated." Id. (citation omitted). For example, despite Plaintiffs' assertion to the contrary, a male correction officer who is the subject of a sexual harassment complaint is not similarly situated to the female officer making the complaint. A fatal flaw in Plaintiffs' effort to demonstrate dissimilar treatment between male and female correction officers is that Plaintiffs' "facts" are their subjective opinions, rather than discrete, specific instances of similarly situated male and female officers who were treated differently due to their sex. See Pls.' Ltr. Br at unnum. pp. 1-2, instances 1-7, dated July

10, 2001. Plaintiffs' subjective beliefs of discrimination are insufficient to show a genuine issue of material fact remaining for trial. Cf. Aramburu v. Boeing Co., 112 F.3d 1398, 1408 n.7 (10th Cir. 1997).

The one instance of specific conduct Plaintiffs use to demonstrate dissimilar treatment is unavailing. Pls.' Ltr. Br, unnum. p. 2, dated July 10, 2001, instance 2. Using this particular instance, Plaintiffs compare the lack discipline of inmates who assault females with a male correction officer who disciplined an inmate for cursing at the officer. The fact that a male correction officer disciplined an inmate on his own initiative, apparently without seeking prior approval of the Detention Center, does little to prove the Detention Center treated disciplinary problems in a dissimilar manner based on the gender of the officer assaulted. Additionally, the documents Plaintiffs use to show that the inmates assaulting female officers were not disciplined were offense reports. Such reports are not designed to document disciplinary measures taken for inmate misbehavior, and I will not construe them as documenting a lack of discipline.

However, this instance raises another problem confronting Plaintiffs. Even at this late date, the Court has yet to be informed who has authority to make disciplinary decisions for inmates who misbehave, whether there are guidelines for making such decisions, and when or how the disciplinary process is invoked. Without some basic sense of how decisions to discipline inmates are reached, I am hardly in a position to state that Plaintiffs have demonstrated that Defendants' disciplinary decisions offended the Equal Protection Clause. From the instance Plaintiffs provide, it appears that corrections officers themselves could mete out discipline. I can hardly fault Defendants because Plaintiffs may have chosen not to discipline inmates whereas one male correction officer disciplined an inmate for cursing. Because Plaintiffs have not produced

competent evidence that similarly situated male and female correction officers were treated with discriminatory intent by Defendants, Defendants are entitled to summary judgment on Plaintiffs' equal protection claims. As another Court has observed, "mere disparate impact is insufficient to demonstrate an equal protection violation." <u>Copeland v. Machulis</u>, 57 F.3d 476, 480 (6th Cir. 1995).

IT IS THEREFORE ORDERED THAT

1. Defendants' motion for summary judgment is GRANTED with respect to Ms. Andazola's and Ms. Earnest's claims that Defendants subjected them to a sexually hostile work environment in violation of Title VII;

2. Defendants' motion for summary judgment is GRANTED with respect to Ms. Perez' Title VII claim of retaliation for denial of leave;

3. Defendants' motion for summary judgment is GRANTED with respect to Ms. Adazola's Title VII claim of retaliation for the denial of light duty work or leave to have surgery;

4. Defendants' motion for summary judgment is GRANTED with respect to Ms. Earnest's Title VII claim of retaliation for the failing to protect her from threatening inmates, for issuing letters of reprimand, and for having to guard Vincent Vasquez;

5. Defendants' motion for summary judgment is DENIED with respect to Ms. Perez' claim that Defendants subjected her to a sexually hostile work environment in violation of Title VII;

6. Defendants' motion for summary judgment is DENIED with respect to Ms. Perez' claim that Defendants retaliated against her by moving her to a different shift, and subjecting her to harassing behavior as a result of complaining about inappropriate comments and touching by Officer Carrera in violation of Title VII;

7.      Defendants' motion for summary judgment is DENIED with respect to all Plaintiffs'

claims that Defendants retaliated against them by delaying or denying their breaks in violation of

Title VII;

8.      Defendants' motion for summary judgment is GRANTED with respect to all Plaintiffs'

First Amendment retaliation claims;

9.      Defendants' motion for summary judgment is GRANTED with respect to all Plaintiffs'

due process claims; and

10.      Defendants' motion for summary judgment is GRANTED with respect to all Plaintiffs'

Equal Protection Clause claims.


**CHIEF UNITED STATES DISTRICT JUDGE**